**TEXAS DEPARTMENT OF HUMAN SERVICES and Eric Bost, Commissioner, Appellants,**

v.

**KEMP HEALTH SERVICES, INC. d/b/a Kemp Care Center, and Ray Yonce, et al., Appellees.**

No. 03–98–00245–CV.

Court of Appeals of Texas, Austin.

Feb. 25, 1999.

Rehearing Overruled July 15, 1999.

John Cornyn, Attorney General, Quincy Quinlan, Assistant Attorney General, Austin, for Appellant.

Barry Bishop, Marnie A. McCormick, Clark, Thomas & Winters, Austin, for Appellee.

Before Justices KIDD, PATTERSON and POWERS.*

JOHN E. POWERS, Senior Justice (Retired).

The Texas Department of Human Services and its Commissioner Eric Bost appeal from a final judgment recovered by Kemp Health Services, Inc. (Kemp), Ray Yonce, and others following a trial without a jury.[1] No findings of fact and conclusions of law were filed. We will affirm the judgment.

## THE CONTROVERSY

The Department entered into a Medicaid-provider contract with LTC Health Management, Inc. (LTC), obligating LTC to provide long-term nursing care to patients in the Kemp Health Care Center (the facility). LTC leased the facility premises from Yonce and others who owned the real property and improvements. For providing such nursing care, LTC was entitled under its contract with the Department to receive periodic payments from state and federal Medicaid

funds. Operations at the facility were subject to regulation by the Department under state and federal law.

▮ After LTC had operated the facility for a time, the Department found LTC in violation of its contract and imposed against the company an administrative penalty in the amount of $84,500. The Department also cancelled LTC's Medicaid contract, based upon the "three strike" rule, but abated the cancellation pending federal approval of this penalty.[2] LTC subsequently notified the Department that the company would not operate the facility after April 1, 1996.

Yonce cancelled LTC's lease of the facility premises and entered into a new lease with Kemp, a corporation having no connection to LTC. Yonce agreed in the lease to indemnify Kemp against any administrative penalties resulting from LTC's operation of the facility.[3] Kemp, a licensee under the Medicaid program, entered into a contract with the Department to provide long-term nursing care to facility patients under the program.

The Department attempted afterward to collect from Kemp the $84,500 penalty imposed against LTC, contending Kemp had become liable under the Department's interpretation of an agency rule. *See* 40 Tex. Admin.Code Ann. § 19.2308 (1977) ("the Rule" hereafter). Kemp, Yonce, and others, sued in the present cause for declaratory and injunctive relief against the Department's attempt to collect the penalty.

*Health Care Ass'n v. Health & Human Servs. Comm'n,* 949 S.W.2d 544, 546 (Tex.App.—Austin 1997, no writ).

---

\* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. In the course of the litigation, Bost succeeded Terry Trimble who had been acting Commissioner and an original defendant.

2. The "three-strike" rule allows the Department to cancel a Medicaid contract for nursing-home care based upon three contract violations of a specified nature. *See Texas*

3. Kemp stipulated at trial that it would not have leased the property from Yonce without the indemnity provision and knew at the time of the Department's interpretation of the rule found at 40 Texas Administrative Code section 19.2308, a rule at the center of the present controversy. *See* 40 Tex.Admin.Code § 19.2308 (1977).

Following a trial, the court below rendered judgment declaring the Rule, as interpreted by the Department, invalid because it was inconsistent with the objectives of applicable statutes and thus beyond the Department's authority to adopt. *See Gerst v. Oak Cliff Sav. & Loan Ass'n*, 432 S.W.2d 702, 706 (Tex. 1968). The judgment denies other declaratory relief requested in the cause and permanently enjoins the Commissioner, the Department, and its representatives and employees from the following: "withholding funds from Kemp ... by reason of 'strikes' and penalties assessed against [LTC] ... and any other actions against the facility or Kemp ... by reason of actions or violations [by LTC] at the facility in Kemp, Texas."

## DISCUSSION AND HOLDINGS

The Department appeals on two issues: (1) whether the Rule is inconsistent with a state statute or a federal statute as interpreted in a federal regulation; and (2) whether the Rule, as applied to Kemp in the present circumstances, deprived Kemp of property without due process of law contrary to article I, section nineteen of the Texas Constitution. In the discussion that follows, we will refer to the statutes and federal regulation upon which the Department bases its contentions. We will not discuss the constitutional issue because we believe the Rule, as interpreted by the Department, is not in harmony with the objectives of applicable statutes as implemented by a state rule and a federal regulation administered by the Department, both of which the Department has misinterpreted.

The Texas Health and Human Services Commission administers in Texas the state and federal elements of the Medicaid program; and under an agreement with the Commission, the Department administers the nursing-facility component of that program. *See Texas Home Mgt. d/b/a Appleby Home v. Texas Dep't of Mental Health & Mental Retardation*, 953 S.W.2d 1, 2 (Tex.App.—Austin 1997, pet. ref'd). The Department possesses the statutory power to adopt legislative rules for "the proper and efficient operation of the Medicaid program." Tex.Hum.Res.Code Ann. § 32.021(c) (West 1990).

The legislative rule under which the Department seeks to impose liability upon Kemp, in the present controversy, provides as follows:

§ 19.2308. Change in Ownership

An ownership change is any change in the business organization that changes the identity of the legal entity licensed to operate the facility.... The [Department] will recognize ownership changes effective as of the date of the legally effective transfer of ownership subject to the following conditions:

\* \* \*

(3) When a change in ownership occurs, [the Department] assigns the agreement to the new owner by issuing a new contract to the new owner.... The new owner's contract is subject to the prior owner's contract terms and conditions that were in effect at the time of transfer of ownership, including, but not limited to, the following:

\* \* \*

(E) compliance with additional requirements imposed by [the Department] and

(F) any sanctions as specified in this chapter relating to remedies for violations of Title XIX nursing facility provider agreements, including ... monetary penalties ... and history of deficiencies.

40 Tex.Admin.Code § 19.2308 (1977) ("the Rule" herein).

 The Department is also responsible for securing compliance with federal regulations pertaining to nursing-home facilities. *See* Tex.Hum.Res.Code Ann. § 32.021(b) (West 1990). One federal reg-

ulation provides as follows concerning Medicaid contracts:

§ 442.14. Effect of change of ownership [4]

(a) *Assignment of agreement.* When there is a change of ownership, the Medicaid agency [the Department] must automatically assign the agreement to the new owner.

(b) *Conditions that apply to assigned agreements.* An assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued, including but not limited to, the following:

\* \* \*

(6) Compliance with any additional requirements imposed by the Medicaid agency [the Department].

42 C.F.R. § 442.14 (1995) (the "federal regulation" hereafter).

■ The Department argues, as it must, that the foregoing federal regulation and the Rule are consistent in their terms, meaning, and objectives; and both authorized the Department to condition its assignment of LTC's Medicaid contract to Kemp upon the "additional requirement" that Kemp pay the $84,500 penalty imposed upon LTC. *See* 42 C.F.R. § 442.14(b)(6) (1995); 40 Tex.Admin.Code § 19.2308(3)(E), (F). The Department so construes the federal regulation and the Rule; that interpretation becomes part of the regulation and the Rule and the statutes they implement. The Department argues in addition that Kemp was also obligated to pay the penalty because Kemp, as assignee of the Medicaid contract, "stood in the shoes" of LTC.[5] We reject these contentions for the reasons that follow.

■ The Department's interpretation of the federal regulation is contrary to its text, meaning, and objective. Subsection (a) of the federal regulation requires that the Department "automatically assign the agreement to the new owner." The objective of this provision is to assure a continuity of care for patients in a facility affected by a change of ownership. *See* comments

---

4. The word "ownership" as used in section 442.14 refers to a licensee's fee or leasehold interest in real property and improvements wherein the licensee operates a nursing-care facility. *See Health Equity Res. Urbana, Inc. v. Sullivan,* 927 F.2d 963, 964 (7th Cir.1991); *Americare Prop. v. State Dep't of SRS,* 241 Kan. 607, 738 P.2d 450, 451–54 (1987).

5. Under the state rule and the federal regulation, the Department is required to "assign" the Medicaid contract to the new operator when there is a change in facility ownership. From this use of the word "assign," the Department argues that the rule and the regulation incorporate the common-law rule that an assignee "steps in the shoes of his assignor." Thus, when Kemp received from the Department an "assignment" of the Medicaid contract previously held by LTC, Kemp became liable instantly for the $84,500 penalty because Kemp "stood in the shoes of" LTC, against whom the penalty had been imposed. This course of reasoning is insupportable for several reasons.

In ordinary usage, the word "assignment" refers to an owner's transfer of his right or interest to another existing person, pursuant to their mutual intention to transfer ownership. All assignments require a transfer, but not all transfers are assignments. *See* 6A C.J.S. *Assignments* § 5, at 594–96 (1975). This ordinary understanding of the word "assignment," in the common law, is not the meaning of the word as it and its variations are used in the Rule and the federal regulation. The word has there a specialized or technical meaning.

The previous *owner* (LTC) assigned, and could assign, nothing to Kemp; it was legally impossible for Kemp to "stand in the shoes" of LTC. Under the federal regulation, the *Department,* not the former owner or licensee, "must automatically assign the" Medicaid contract "to a new owner," Kemp in this instance. Moreover, the Department must make the "assignment" by cancelling the former contract and issuing a new and independent contract to the successor licensee, which the Department did in this instance by entering into a new contract with Kemp after cancelling the LTC contract. The LTC contract having been cancelled, it was hardly susceptible of "assignment" in the common-law meaning of that word. The figure of speech referring to "shoes" is meaningless in this context.

at 45 Fed.Reg. 22, 935 (1980). The federal regulation was construed in *Chezem v. Beverly Enterprises-Texas, Inc.*, 66 F.3d 741 (5th Cir.1995). In that litigation, the Department argued that its rule, prohibiting the transfer of a Medicaid contract within three years of its making, imposed a valid "additional requirement" under subsection (b)(6) of the federal regulation. The court rejected the argument because the three-year rule "contravenes the plain language of the regulation, which requires *automatic* assignment *without qualification.*" *Chezem*, 66 F.3d at 743 (emphasis added). We adhere to this interpretation of the federal regulation. Thus, the Department was not free in the present case, under the federal regulation, to qualify the transfer to Kemp by conditioning it upon the "additional requirement" that Kemp pay the $84,500 penalty imposed against LTC.

■ The same result is required by the very text of the federal regulation and the Rule. Subsection (b) of the federal regulation provides that any assignment of the Medicaid contract is subject to "all applicable statutes and regulations" as well as "the terms and conditions under which" the Medicaid contract *"was originally issued."* 42 C.F.R. § 442.14(b) (1995) (emphasis added). Item (6) of subsection (b)—"[c]ompliance with any additional requirements imposed by the" Department— is expressly conditioned upon the initial proviso that any "additional requirements imposed by the Department" must be a term or condition of the Medicaid contract as "it was originally issued." The sanctions imposed against LTC were not a part of LTC's contract as "it was originally issued," although they arose from violations of LTC's contract obligations.

The Rule contains a similar proviso, as follows:

> The new owner's contract is subject to the *prior owner's contract terms and conditions* that were in effect at the time of transfer of ownership, *including,* but not limited to, the following:

(E) compliance with additional requirements imposed by (the Department) and

(F) any sanctions ... including ... monetary penalties ... and history of deficiencies.

40 Tex.Admin.Code § 19.2308(3)(E), (F) (1977). The federal regulation plainly forbids the Department's imposing against a succeeding owner sanctions imposed against the former owner. *See Chezem,* 66 F.3d at 743. The Rule, however, appears to authorize the Department to do just that. May the Department therefore obstruct the force and effect of the federal regulation under the authority given in the Department's own Rule?

Subsection (3), (E) and (F) of the Rule mean exactly what the Department contends—it may condition its assignment of a Medicaid contract by an additional requirement that the assignee satisfy any sanctions, including monetary penalties and history of deficiencies imposed against the previous licensee. The Rule does not contradict the federal regulation, however, because subsections (E) and (F) of the Rule become operative only upon a "change in ownership," and that term has different meanings under the Rule and the federal regulation.

The federal regulation takes effect on a simple "change of ownership." 42 C.F.R. § 442.14(a) (1995). The Rule, in contrast, takes effect on a "[c]hange in [o]wnership" that is particularly defined as follows:

> An ownership change is any change in the business organization that changes the identity of the legal entity licensed to operate the facility.

40 Tex.Admin.Code § 19.2308 (1977). Striving for consistency in the Rule and the federal regulation, the Department arbitrarily imputes the same meaning to both—each contemplates, in the Department's view, a simple change in ownership of facility premises. While that is certainly the meaning of the federal regulation, the text of the Rule will not reasonably sustain that meaning.

The Department interpretation of the Rule would be reasonable if the rule defined a change in ownership as "any change in the ... identity of the legal entity licensed to operate the facility."[6] This is, however, only half of the definition laid down in the Rule. The Department interpretation becomes unreasonable under the entire definition set out in the Rule, which is "*any change in the business organization* that changes the identity of the legal entity licensed to operate the facility." The Rule thus requires the simultaneous existence of two elements: (1) a change in the business organization of a licensee that (2) results in a change in the identity of the legal entity licensed to operate the facility. While the identity of the legal entity licensed to operate the facility changed in the present cause, from LTC to Kemp, the change was not the result of "any change in the business organization" of LTC or any other entity.

The definition of "change in ownership" contained in the Rule suggests that the Rule has a different objective than does the federal regulation. The Rule appears to be designed to prevent a licensee's evading sanctions or any onerous provisions in its Medicaid contract by the simple device of dissolving or revising the licensee's existing business organization in such a way as to substitute a technically different "legal entity" as the new owner—a change from a corporation to a partnership, for example. To assure that such colorable changes do not succeed in evasion, the Rule provides expressly that the Department may condition transfer of the Medicaid contract to the new legal entity upon its compliance with the original contract terms and any additional requirements imposed by the Department, including the payment of penalties or the satisfaction of other sanctions imposed against the former entity. The necessity

and justice of imposing the original contract terms and any sanctions against the new owner, in such circumstances, is obvious. No such circumstances exist in the present controversy.

The Department is under a duty to enforce both the Rule and the federal regulation. We believe our construction of the Rule allows some meaning to be given the expression "any change in the business organization," while the Department interpretation renders that expression meaningless. Moreover, if the Rule was intended to have the same meaning as the federal regulation, the language chosen for the Rule was singularly inapt for expressing that intention. Finally, our construction avoids the absolute contradiction between the federal regulation that requires an automatic assignment without qualification and a state Rule that authorizes the Department (under its strained interpretation of the Rule) to qualify the assignment by "additional requirements" imposed as conditions.

We hold the text of the Rule will not reasonably sustain the Department interpretation. That interpretation is therefore not binding on a court. *See Railroad Comm'n v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1027–28 (1942). Under our interpretation of the rule, it has no application in the present litigation because Kemp did not become a licensee as the result of a "change in the business organization" of a preceding licensee.

Concerning the federal regulation, we hold it did not authorize imposing the $84,-500 penalty or LTC's history of deficiencies against Kemp because these were not "terms and conditions under which" the Medicaid contract "was originally issued" to LTC, although they undoubtedly arose

---

**6.** If such was the meaning of the Rule, it would automatically result in a flagrant contradiction between subsections (3)(E) and (F) of the Rule (authorizing the Department to condition its contract with the new licensee on its satisfaction of sanctions imposed against the former licensee) and the federal regulation (requiring a transfer of the Medicaid contract automatically and "without qualification").

from LTC's obligations under that contract. *Chezem*, 66 F.3d at 743.

We affirm the trial court judgment.